**Wilbert ALLEN, Plaintiff,**

v.

**CITY of YONKERS; Yonkers Community Development Agency; Angelo R. Martinelli, Mayor; Dr. Sal Prezioso; Michael Edelman; Harold Peterson; Eleanor Kleine; All in their Individual Capacities and as Members of the Board of Directors of the Community Development Agency, Defendants.**

**No. 84 Civ. 0639 (VLB).**

United States District Court,
S.D. New York.

April 15, 1992.

Michael H. Sussman, Goshen, N.Y., Sandra B. Durant, Durant & Isaacs, New York City, for plaintiff.

Christine Lomolino, Corp. Counsel, City of Yonkers, Yonkers, N.Y., for defendants.

## MEMORANDUM ORDER

VINCENT L. BRODERICK, District Judge.

### I.

This action arises from plaintiff Wilbert Allen's termination in October 1982 as director of the City of Yonkers Community Development Agency and as commissioner of the City of Yonkers Department of Community Development ("YCDA"). Plaintiff alleges that these terminations violated 42 U.S.C. § 1981, 42 U.S.C. and § 1983, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and also alleges breach of an employment contract entered into between him and the board of directors of the Yonkers Community Development Agency in November 1981.

Defendants are the City of Yonkers (the "City" or "Yonkers") and the YCDA (collectively sometimes the "institutional defendants"); and the following in their individual capacities and as members of the YCDA board in October 1982: Angelo Martinelli, Sal Prezioso, Michael Edelman, Harold Peterson and Eleanor Kleine (sometimes the "individual defendants").

The court has subject matter jurisdiction over the Title VII claim under 42 U.S.C. § 2000e and those under 42 U.S.C. § 1981

and 1983, pursuant to 28 U.S.C. §§ 1331 and 1343. The plaintiff satisfied the jurisdictional prerequisites for a Title VII case by timely filing a charge with the Federal Equal Employment Opportunity Commission which issued a right to sue letter on October 28, 1983. The plaintiff's state law claim is within the pendent jurisdiction of the court. See 28 U.S.C. § 1367.

The case was tried to the court without a jury and the following are my findings of fact and conclusions of law under Rule 52, Federal Rules of Civil Procedure.

## II.

I find that the institutional defendants discriminated against plaintiff because of race in contracting in violation of 42 U.S.C. § 1981 and in employment in violation of 42 U.S.C. § 2000e, and in violation of plaintiff's civil rights under federal law in violation of 42 U.S.C. § 1983, and also breached plaintiff's contract, but find no liability on the part of the individual defendants.

There are various reasons for the differential treatment of the institutional and individual defendants.

As to the Title VII claims under 42 U.S.C. § 2000e, the institutional defendants are the employers under the statute and the individuals do not qualify as such in their individual capacities.

As to the 42 U.S.C. §§ 1981 and 1983 claims, individuals may be held liable, and indeed culpability on the part of the ultimate policy makers is a prerequisite to municipal liability. *Jett v. Dallas Independent School District*, 491 U.S. 701, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989); *City of St. Louis v. Praprotnik*, 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). *Respondeat superior* does not apply to the liability of municipal entities under these provisions, in order to insure that only the actual policy of the entity and not violations of policy or independent actions at lower levels lead to recourse to the deep pockets of taxpayers of political subdivisions of the state.

Here, the ultimate policymaking authority rested, as to Yonkers, with the mayor, the city manager, and the city council, and as to the YCDA, with its board, as described in greater detail below, based on both written sources of legal authority under state law, and " 'custom or usage' having the force of law," *Jett*, 491 U.S. at 737, 109 S.Ct. at 2723, quoting *Praprotnik*, 485 U.S. at 124, 108 S.Ct. at 924.

As also outlined in greater detail below, these ultimate policymakers or "decisionmakers" acted intentionally in an unconstitutional and illegal discriminatory manner. However, pinpointing those with such authority is not the end of the road. As indicated in *Praprotnik* at 126, 108 S.Ct. at 925:

"We are also aware that there will be cases in which policymaking responsibility is shared among more than one official or body."

In the present case there was no videotape of discussions between the mayor and city manager behind closed doors or between those officials and various council and board members; subsequent recollection and oral testimony about what was said in the course of numerous and at times acrimonious arguments is not particularly reliable at a sufficiently fine-tuned level of detail to permit a conclusion whether A and B agreed and conspired, A rather than B was the moving force acting deliberately while B acquiesced, or vice versa. This difficulty is increased because not merely the decisionmakers initiating an action but final policymakers embracing the council and board must be considered. Id. at 127, 108 S.Ct. at 926. Those bodies as such acted deliberately and unconstitutionally, but it is as impossible to determine who had what share of the blame for this as it would have been had those bodies acted by secret ballot and no one remembered who said what during the debate.

In sum, from all the evidence it is clear that the authorized Yonkers city and Community Development Agency decisionmakers as a group acted deliberately and unconstitutionally and thus the institutional defendants are liable without resort to *re-*

*spondeat superior* or cognate concepts, even though it is not possible by a preponderance of the evidence to subdivide the culpability of individuals within the group of decisionmakers or to say that all acted deliberately.

I find from all of the evidence including demeanor of the witnesses and absence of detail supporting the explanations given for plaintiff's treatment, that the discrimination was brought about because plaintiff's race, combined with his position in implementing city policy with regard to housing at the time involved in Yonkers history, made plaintiff a target for resentment against national policy in that field, which he would not have been but for his race.

Evaluating the asserted reasons for defendants' conduct and plaintiff's performance on the job necessitates a somewhat extended analysis of plaintiff's dealings with defendants.

### III.

Before setting forth the particular facts surrounding plaintiff's termination, a brief explanation of the organization of the Yonkers city government, the Yonkers Department of Development ("DCD") and the YCDA is important.

The government of the city of Yonkers consists of a city council which is comprised of thirteen members. Twelve of these members are elected from the different city wards. The mayor of the city is the thirteenth member and is elected from the city at large. City council members are elected for a term of two years. A nonelected city manager is appointed by the city council and serves at the will of the city council. The city manager is the chief executive officer of the city.

The DCD is a city department, administered by a commissioner who is appointed by the city manager and serves at the manager's pleasure. The commissioner of DCD is responsible for coordinating community planning and development projects and for overseeing the functions of the Planning Bureau and the Bureau of Housing and Buildings.

The YCDA is an entity created under the laws of New York State by the Yonkers city council for the purpose of developing community projects. The YCDA has the power to plan, undertake, and effectuate urban renewal projects subject to the approval of the city council. The YCDA receives its funding from the United States Department of Housing and Urban Development ("HUD") through the community development block grant ("CDBG") program.[1] It is run by a board which consists of seven members. The membership of the YCDA board is set by law; the city manager and mayor of Yonkers are the chairman

---

1. The CDBG Program is an entitlement program. Communities eligible under the program, cities with populations over 50,000, must apply to HUD and satisfy "admission requirements."

Among the requirements for CDBG eligibility is the development and approval by HUD of a housing assistance plan ("HAP") for the community. The HAP surveys the housing conditions in the community, describes the housing needs of lower income households, and specifies the type and location of housing assistance to be provided to these groups.

One of the goals of the CDBG program is to promote a dispersal of subsidized housing opportunities (particularly for minorities), and one of the criteria by which a HAP is judged is the extent to which it furthers that goal. A grantee's performance under the CDBG program is measured, in part, by the efforts made toward providing the housing assistance specified in the HAP.

Once HUD certifies a community's eligibility, it receives a determined sum of money each year. This must be used primarily for the benefit of those of low and moderate income. The community's application contains a one year and five year plan proposing how it plans to spend the monies it is to receive consistently with its short term and long terms goals. These terms must be consistent with the aims of the CDBG program. If HUD approves the application, it sends a contract to the community outlining certain conditions for the expenditure of federal funds which the community must agree to. The conditions imposed by HUD may relate to the prior plans submitted by the community to HUD.

Under the program HUD monitors the grantee to determine that the monies are being expended consistently with the program's design and the community's application. The community also has to account to HUD and show that its housing program is in fact furthering statutory goals.

and vice-chairman of the board. The other members of the board are the city planning director, the city corporation counsel, the city comptroller, and two citizens appointed by the mayor with the advice and consent of the city council.[2] The role of the YCDA director is to implement policy as set by the board. The director's duties primarily entail administering federal funds received through the CDBG and Urban Development Action Grant ("UDAG") Programs[3] for housing and community projects, and administering the YCDA's leased housing programs.[4] The director has no independent, ultimate or decisive powers and no policymaking authority or duties, but instead—as also confirmed by instances cited below—carries out the instructions of the manager, mayor and council, albeit at a high level of subordinate authority.

## IV.

Plaintiff, who is black, had studied and worked in the fields of architecture and urban planning for over 20 years. Plaintiff holds a B.A. in architecture from Hampton Institute and a M.A. in urban and regional planning from the University of Illinois. Plaintiff also studied real estate development and architecture at Harvard University and New York University.

During the early 1970's, plaintiff worked as an urban planner for the city of Newark. In 1973 plaintiff was promoted to the position of special assistant to the executive director of the office of policy and development of the mayor of Newark.

Some time later he became city planning director for the city of Newark, and in 1978 he was again promoted to the post of executive director of the office of policy and development of the mayor of Newark. In Newark, Allen secured ten UDAG's[5] for the city of Newark and became familiar with the numerous federal programs relating to housing and community development.

In the latter part of 1979, plaintiff left the job with the city of Newark and began his own consulting business, Urban Development and Management, Inc.

In early 1980, plaintiff applied for a job with the City of Yonkers as commissioner of DCD and as director of YCDA. Plaintiff was interviewed for the positions on several occasions. During the course of these interviews he met with the commissioner of personnel, the mayor, the city manager, the assistant city manager, and the acting director of YCDA.

During the interview process plaintiff learned generally of the problems that the YCDA was encountering in its relationship with HUD. In 1980, HUD had conducted an audit of YCDA covering the period from July 1, 1978 through June 30, 1980. HUD took the position in the audit that YCDA had made many expenditures which were improper under HUD's guidelines and that the City of Yonkers had misspent approximately six million dollars. Plaintiff was informed by the city manager that the City of Yonkers sought, as director of the

---

**2.** The comptroller and corporation counsel are both appointees of the city manager.

**3.** The UDAG program is administered by HUD centrally. In order for a project to be eligible for UDAG funds, the community where the project is located must participate in the CDBG program and must be certified to submit specific UDAG applications. Compliance with federal non-discrimination statutes governing housing and employment is a necessary condition for participation. UDAG applications are nationally ranked against one another.

**4.** The leased housing programs consisted of the §§ 8 and 23 programs which were administered by HUD to provide rental subsidies to tenants. The § 23 program commenced in the late 1960's. Pursuant to this program, the city di-

rectly contracted with landlords who were interested in renting to tenants eligible for the program, i.e., low income tenants. If a landlord agreed, the city would send eligible tenants to those buildings and pay the landlords a portion of the rent owed on the apartment.

Beginning in 1975, HUD made available § 8 certificates for eligible renters. Under this program, § 8 renters were able to rent from any landlord willing to accept § 8 certificates in lieu of a percentage of the rent. That percentage represented by a § 8 certificate was then paid by a local agency on behalf of a certificate holder.

In Yonkers both the DCD and the YCDA administered the § 23 program; and YCDA, alone, processed § 8 certificates.

**5.** See note 3, *supra*.

YCDA, someone who had experience with CDBG and UDAG programs and who was qualified to develop immediately a comprehensive response to the problems raised by HUD's audit of YCDA.

After Yonkers city officials reviewed many applications they offered plaintiff the two positions, which he accepted. In June 1980, the city hired plaintiff as commissioner of DCD; YCDA by resolution of its board of directors appointed plaintiff as director. His annual salary as commissioner of DCD was fixed at $1,000 and his annual salary as director of the YCDA was set at $39,500. Plaintiff was the first non-white to hold these positions.[6]

## V.

Mr. Allen initially devoted most of his attention to analyzing, and then to formulating a response to, HUD's audit of the YCDA. Plaintiff began by reviewing the HUD audit, as well as other audits of YCDA which had been conducted by a private accounting firm, Seidman & Seidman. For the years 1978 and 1979, HUD had found 23 instances of money being spent improperly by the YCDA. HUD had noted that YCDA had no system to insure that persons paid by YCDA were working on YCDA related projects. According to HUD's findings, the City of Yonkers might be obliged to refund six million dollars to HUD. Mr. Allen learned that the YCDA was in jeopardy of losing previously acquired UDAG funds and of being terminated from the CDBG program. Plaintiff's review of the Seidman & Seidman audits revealed that the YCDA had not complied with previous accounting recommendations suggested to improve the agency's control of expenditures.

Plaintiff hired Anthony LaBreglio, a former HUD employee, to work on developing and implementing accounting and financial management systems seeking to correct some of the problems with the administration of YCDA noted in the audits. Plaintiff installed a system which put controls in place before funds were disbursed, and which provided mechanisms for tracking the financial status of YCDA projects and activities.

After completing his analysis of the HUD and Seidman & Seidman audits, plaintiff prepared a response to each of the findings articulated in the HUD audit. His central objective was to avert the loss of federal funding by the CDBG and UDAG programs. These responses seem to have satisfied HUD, which never, while plaintiff was employed in Yonkers, requested clarification from YCDA of its responses to the audit findings.[7] The City of Yonkers has not been required to pay the six million dollars to HUD, which HUD had cited in its audit. Nor did HUD prohibit Yonkers from participating further in the CDBG or UDAG programs.

Another matter which commanded plaintiff's immediate attention at the outset of employment as director of the YCDA was to see to it that the City of Yonkers complied with nine conditions imposed by HUD in 1980 for the receipt of 4.6 million dollars in CDBG funds. These conditions included, among others, that the YCDA provide monthly status reports on the development of its projects and its expenditures, that it develop a homesteading program, and that it develop a housing complaint process. HUD officials had stressed that Yonkers' participation in the UDAG and CDBG pro-

---

**6.** The manner in which plaintiff's salary was structured, $1,000 a year as commissioner of DCD and $39,500 a year as director of YCDA, suggests that the jobs are interrelated and that the city envisioned plaintiff to have greater responsibilities as director of YCDA than as commissioner of DCD. Another possible explanation for the disparate distribution of plaintiff's salary may have been the city's desire to have the federal government foot the bill.

While it seems to have been the practice to hire one person for both positions, it is not

required by the Yonkers' city charter or the YCDA by-laws.

**7.** HUD notified the city that no further action would be taken regarding the audit until review by the Justice Department was completed. The Justice Department was reviewing the activities of the YCDA in contemplation of filing a lawsuit against the city. The Justice Department was also involved in HUD's decision in June 1980 to impose certain conditions upon the city's receipt of CDBG funds.

grams would be terminated if the city failed to meet these conditions. All of these requirements were satisfied by the YCDA under plaintiff's direction.

HUD had also directed Yonkers to take a number of steps to expand housing opportunities for racial minorities in east Yonkers, an area of the city with a low concentration of minority population. In fact, less than four weeks after Mr. Allen commenced employment, HUD expressly conditioned YCDA's receipt of CDBG funds upon YCDA's pledge on behalf of Yonkers—

(a) to construct 100 units of assisted housing for families in east Yonkers;

(b) to prepare and submit to HUD an inventory of available east Yonkers sites which could be used for the construction of subsidized housing;

(c) to develop and implement a fair housing strategy; and

(d) to enact a fair housing ordinance.

Mr. Allen undertook measures to help the city to comply with these conditions. Thus under Mr. Allen's supervision the planning director, Phil Pistone, prepared a list of 14 potential sites in east Yonkers for low and moderate income assisted housing.

The issue of federally funded low and moderate income scattered-site housing in east Yonkers was a hotly debated subject in Yonkers. City council members from the east and north sections of Yonkers were in general hostile to the development of such housing, whereas the city council members from southwest Yonkers were not opposed to it. Thus the submission to HUD of possible sites for such housing was vehemently opposed by many members of the city council. Despite this opposition City Manager Fox submitted to HUD the inventory of sites developed under Mr. Allen's direction. HUD initially found three of the proposed sites to be suitable for developing subsidized housing; it determined that the other 11 sites were unacceptable for topographical or environmental reasons.

Mr. Allen also addressed the problem of implementing a Fair Housing strategy.

After consulting with the city manager, the city director of human rights, Mr. Scott, and representatives of HUD's fair housing program, Mr. Allen recommended that $20,-000 of YCDA's budget be appropriated for such purpose. Mr. Allen and Mr. Scott undertook to establish an outreach program, directed toward educating and counseling minority persons about their rights as tenants, and toward encouraging landlord receptivity to minority tenants.

Mr. Allen also urged the adoption by the city council of a fair housing ordinance, which would announce Yonkers' commitment to providing housing to minorities. City Manager Fox raised the topic with the city council, but it refused to adopt it. Plaintiff later apprised HUD of the steps which he and the city manager had taken with respect to a fair housing ordinance, and of the city council's position.

Shortly after assuming his positions in Yonkers plaintiff undertook supervision of the development of the 1980 application for CDBG funds. This annual application, the preparation of which Mr. Allen also supervised in 1981 and 1982, set forth proposals for the expending of CDBG funds to be allotted to Yonkers.

Its preparation required familiarity with federal guidelines, consistent with which it was necessary to designate target areas in Yonkers which had high percentages of low and moderate income persons. Contact with diverse community groups was necessary to develop projects which were consistent with federal standards as to purpose and as to cost, efficiency, and manageability, and to develop a proposed funding level with respect to each of those projects. The amount of money sought in the application depended, in turn, upon funds made available to HUD for CDBG purposes: for 1980, YCDA was allocated $4,603,000 in CDBG funds; for 1981, it was allocated $4,328,-000; for 1982, it was allocated slightly less than $4,000,000.

To keep apprised of community developments Mr. Allen attended every city council meeting and often spoke at community meetings.

Mr. Allen administered the YCDA in a competent and professional manner. Plaintiff's staff of approximately 40 persons was divided into five areas: personnel service, rehabilitation, technical service, fiscal operations and acquisition. Together with the division heads, who reported directly to him, plaintiff set monthly goals, and at weekly staff meetings progress made in achieving the goals was monitored and, where appropriate, adjustments were made. A bi-annual evaluation process for all employees was established. To keep the city manager informed of YCDA activities, Mr. Allen regularly transmitted executive reports to his office.

Plaintiff had responsibility, as director of YCDA and commissioner of DCD, for the administration of the housing programs subsidized by HUD for the benefit of the poor. This responsibility was competently discharged, as reflected in favorable reviews by HUD of YCDA while plaintiff administered it,[8] as well as in favorable assessments by members of the city council representing those areas of Yonkers where such subsidized housing was prevalent.

HUD regularly monitored YCDA's activities. In particular, it supervised the agency to insure that funds were expended on HUD-approved activities. Under Mr. Allen's tenure, HUD's evaluation of YCDA improved. By the end of 1981, it was considered one of the better development agencies in the Region 2 area, which consisted of three States. In March 1982, a HUD report concluded:

> On the whole the Agency is a very good one. All documentation is on file, well organized and easily obtainable. Without question the Program has made very positive strides over the course of these past 2½ years since I was first involved in Yonkers. I would like to commend the staff for a job well done ...

The progress that YCDA made under plaintiff's leadership is confirmed as well by an audit of YCDA by Seidman & Seidman.

Plaintiff also competently administered the DCD. On at least a monthly basis, he met with the directors of each department and received monthly reports from them, which he passed along to the city manager. He also provided the city manager with executive reports of the department at regular intervals.

### VI.

In June 1980, plaintiff approached City Manager Ravo to request an employment contract. He wanted a contract to enable him to correct the extensive and somewhat politically sensitive problems raised by the HUD audit without fearing for his job security. Mr. Ravo felt that before they discussed a contract, plaintiff should resolve the issues surrounding HUD's audit of YCDA. Plaintiff's race was already at least a factor underlying reluctance to give him a contract at the outset, despite his obvious qualifications.

Plaintiff again requested a contract in May 1981 with Mr. Ravo's successor, Eugene Fox. At this time, plaintiff's desire for a contract stemmed from a specific desire to evaluate alternative opportunities which had been suggested to him. A few months later, in the fall of 1981, negotiations were initiated between plaintiff and YCDA concerning an employment contract for plaintiff as YCDA director.

On November 4, 1981, city-wide elections were held resulting in election of a new mayor and a different majority on the city council. Mr. Martinelli, who had served as Mayor of Yonkers from January 1, 1974 through December 31, 1979, defeated Mayor Loehr for the term beginning January 1, 1982.

In the latter part of November 1981, City Manager Fox brought the issue of plaintiff's contract to the YCDA board. By a four to two vote, the board approved a two year employment contract for plaintiff, extending to November 30, 1983. The contract provided for an annual salary of $44,-900.00. It also set forth procedures, including provisions for notice and a hearing, to be followed in the event that the board

---

**8.** HUD monitors the performance of grantees by conducting monitoring reviews, audit reports, reviewing status reports and soliciting citizens' comments.

wanted to terminate Mr. Allen. The board's resolution declared that a contract was in order because of plaintiff's excellent job performance.[9] However, by contrast to offers later made to others who were not more qualified, within a sufficiently short time to be comparable, the Allen contract failed to provide for any severance pay in the event of termination.

Thus, although a contract was granted with frank recognition of plaintiff's excellent performance, it was not on a par with comparable Yonkers offers during a relevant time period. The resistance, which became obvious to me during the trial and from the entire history of the relationship between Yonkers and plaintiff as discussed below, to a nonwhite incumbent in plaintiff's position was thus overcome at that time sufficiently to permit a contract to be granted, albeit under less favorable conditions offered to others within a relevant time span.

The evidence, primarily that subsequently set forth (see particularly Part IX below), leads to the clear conclusion that reluctance to commit Yonkers to a nonwhite in the position involved, while temporarily overcome sufficiently for the contract to issue, was not overborne sufficiently to grant a contract equal to that offered during the relevant period to other equally or less qualified applicants. During the entire period covered by the events described here, having a nonwhite in the position involved was considered by Yonkers decisionmakers to be problematic, leading to differentially less favorable treatment.

The minutes of the board meeting reflect that Mr. Allen's fine job performance was the reason for awarding him a contract. With the change of administration in Yonkers city government in January 1982, the membership of the YCDA board changed dramatically, and plaintiff's contract—already delayed initially despite plaintiff's obvious qualifications—became a far more intense issue. Mr. Cola, who had been appointed in 1979 a citizen member of the YCDA board, and who in 1982 was a newly-elected city council member, wrote in late November 1981 to HUD's area manager questioning the propriety of plaintiff's contract with YCDA. He suggested that the vote of the board authorizing the contract was improper; he contended that the vote of one board member, Mr. Pistone, was compromised. Plaintiff in his capacity as commissioner of DCD supervised Mr. Pistone, the planning director of DCD. Mr. Pistone had been planning director for at least 15 years. He had been appointed by the city manager and could only be fired for cause by the city manager. The position of planning director qualifies as a civil service position. However, absent evidence that this board member's vote would have been decisive, its relevance appears minimal and the objection to the contract appears pretextual, masking its motivation by other factors.

In March 1982, after making inquiries into the vote and the relationship between Mr. Pistone and plaintiff, HUD responded in a letter to the Yonkers authorities:

> This is in response to your question regarding a possible conflict of interest in the approval of an employee contract between Mr. Wilbert Allen and the Yonkers Community Development Agency. Your inquiry raised the question as to whether such a conflict of interest existed when the Planning Director, who is under Mr. Allen ... voted for approval of Mr. Allen's contract, in the Planning Director's capacity as a member of the YCDA Board.
>
> This office has reviewed the matter in question and we have determined that in order to avoid any conflict of interest in this situation, the vote of the YCDA Board should be ratified with the Planning Director abstaining from the voting process. We are recommending that this

---

9. The five members of the board in favor of the contract were: City Manager Eugene Fox, Mayor Gerald Loehr, Corporation Counsel, Arthur Doran, Planning Director Philip Pistone, and citizen member Randy Velez; the two members of the board opposed were: Comptroller Harold Peterson and citizen member Charles Cola. The basis for Mr. Peterson's opposition was unrelated to plaintiff's job performance; he believed that contracts for such positions were not appropriate.

procedure be followed by the YCDA Board whenever any such similar conflict of interest situation is presented.

The HUD letter did not indicate that the Allen contract was improper or void or that further action was required; it merely suggested optional further corrective action.

After receiving a copy of HUD's letter, City Manager Prezioso informed plaintiff that in his opinion his contract with YCDA was null and void. Plaintiff, in response, sent City Manager Prezioso a letter expressing his belief that the contract was still in effect.

On April 19, 1982, the YCDA board convened and, by a vote of four to one, declined to ratify Mr. Allen's contract.[10] At the time of the vote, no one on the board expressed any dissatisfaction with plaintiff's job performance. Some members of the board expressed their sentiment that the issue revolved around the validity of the contract, not Mr. Allen's performance on the job. Plaintiff felt that the board's vote was improper and that his employment contract was still in effect; plaintiff determined to continue to perform all assigned duties accordingly, expressing these sentiments to both Mayor Martinelli and City Manager Prezioso.

## VII.

In the early months of 1982, Mr. Allen attempted to apprise the new mayor and the city manager's office of Yonkers' relationship with HUD and of the progress of various YCDA projects as well as other development projects. He provided the mayor and city manager's office with copies of the 1980 HUD audit, Seidman & Seidman audits, the Agency's responses thereto and with status reports concerning YCDA.[11] He sent Mayor Martinelli a memorandum describing the variety of different economic tools that were being utilized by YCDA to construct public housing in Yonkers. He briefed the new mayor on strategies to enhance economic development in the city and provided him, on request, with a description of the status of the Yonkers Industrial Development Agency ("IDA").[12]

In sum, Mr. Allen was responsive to the needs of the new administration and provided it with whatever information was necessary to bring it up to date. Notwithstanding the purported revocation of his employment contract, plaintiff continued diligently to execute his responsibilities as commissioner of DCD and as director of the YCDA. He met on almost a daily basis with the city manager and he continued his practice of submitting to the city manager's office monthly executive reports providing updated information on the status of YCDA projects. He also continued, in his capacity as commissioner of DCD, to meet on a regular basis with the directors of planning and of housing and building, and to provide reports to the city manager.

The new mayor and city manager quickly learned of the strides of YCDA under Mr. Allen's directorship, which were the subject of local publicity in Yonkers. Mayor Martinelli and City Manager Prezioso attended a meeting with HUD officials in March 1982, at which HUD officials were complimentary of the management of YCDA. In May 1982, the city manager wrote to a HUD official expressing his pleasure with HUD's

---

**10.** The four board members opposed to ratification were: City Manager Sal Prezioso, Mayor Angelo Martinelli, Comptroller Harold Peterson, and citizen member Eleanor Kleine. Citizen member Randy Velez was the one member in favor of ratification. Mr. Pistone abstained from the vote. Corporation Counsel Michael Edelman, who also abstained from the vote, stated that in his opinion the contract was invalid due to the conflict in interest as a result of Mr. Pistone's position. Mr. Edelman abstained because he felt that as corporation counsel he would have to defend the board's action, if it was challenged.

**11.** On August 12, 1982, Mr. Allen again transmitted these documents to the city manager's office, as well as a detailed memorandum concerning the position of YCDA with respect to the audit.

**12.** The IDA is a public benefit corporation whose purpose is to undertake any capital improvements necessary to promote industry and commerce. The powers of the IDA include the exercising of eminent domain, the accepting of gifts, the borrowing of money and the issuing of bonds. In 1980 and 1981, the IDA for the city of Yonkers had been inactive.

positive evaluation of YCDA. Moreover, on October 8, 1982, Dr. Prezioso and Mayor Martinelli received an audit of certain aspects of YCDA which again confirmed the improvements at YCDA instituted by Mr. Allen.

From the start, plaintiff's relationship with the new mayor turned out to be strained. At one of their first meetings, Mayor Martinelli told Mr. Allen that he envisioned himself as a strong mayor who would control the economic development of Yonkers. During a trip to Boston in June 1982, Mayor Martinelli explained to Mr. Allen that Mr. Allen was not popular with some of his Republican colleagues, but that the mayor would be satisfied if Mr. Allen did what the mayor wanted. The mayor's desire to dominate economic development in Yonkers concerned the plaintiff since as a result, plaintiff's authority as commissioner of DCD and director of YCDA would be undercut.

In early 1982 the city council adopted a resolution which delegated to the office of the mayor primary responsibility for economic development activities. Prior to this, responsibility for this area rested primarily with YCDA. In addition, in 1982, the IDA, which had been dormant since 1980, was reactivated, and the mayor was designated as chairman. That position had previously been held by the city manager.

With respect to some of the projects which had been undertaken by YCDA prior to Mayor Martinelli coming to office, there were differences of opinion between plaintiff and the mayor. The events surrounding the Nepperhan development project and the waterfront project are illustrative.

The Nepperhan development project involved the rehabilitation by YCDA of an old A & P building, located in a predominantly minority neighborhood in Yonkers, for use as a community facility. As of 1982, YCDA had a standing commitment to rehabilitate the building. HUD had approved the project, and YCDA was prepared to allow contractors to make bids on

the project when Mayor Martinelli decided that the project should be halted.

Mayor Martinelli explained that in his opinion the neighborhood group did not possess the skills to maintain and manage such a facility. The mayor also indicated that he did not feel much responsibility towards the neighborhood since it did not support his election. Mr. Allen disagreed with the mayor: he felt that the neighborhood group was capable of managing the project and that the YCDA had an obligation to complete the project. As a result of the mayor's opposition, the YCDA board voted that no further work be done on the Nepperhan development project.

The waterfront project was another project which provoked tension between plaintiff and Mayor Martinelli.

In early 1980, at the time Mr. Allen was being hired, the City of Yonkers finalized a contractual memorandum of understanding with Yonkers Waterfront Associates ("YWA"),[13] a developer chosen to develop the waterfront area of Yonkers. The memorandum of understanding identified the contracting parties and set forth their respective responsibilities regarding the development project. The waterfront project, as conceived in 1980, was a $166 million undertaking to consist of a marina, luxury housing, commercial space and a hotel.

Under the memorandum of understanding, the city had an obligation to make a good faith effort to raise a portion of the $166 million; the rest was to be raised by the developer. In particular the city was required to submit a UDAG application for $20 million and to attempt to raise another $19 million from other sources. In early 1981, the YCDA under plaintiff's direction submitted the UDAG application to HUD. HUD refused to approve the application because (1) the project was too large and (2) the developer, YWA, had not secured firm financial commitments. In August 1981, HUD rejected a second UDAG application submitted by the YCDA because of the developer's inability to secure capital.

---

**13.** YWA was chosen as the developer for the project in May 1979. One of the three partners of YWA, Melvin Weintraub, was a friend of Mayor Martinelli. In 1982, Mr. Weintraub bought out his partners, making him the sole owner of YWA.

In December 1981, the consultant hired by the YCDA to assess the environmental impact of the project expressed concern that the project, as proposed by YWA, was too expansive and recommended that a small scale alternative project be initiated.

When Mayor Martinelli took office he displayed an avid interest in the waterfront project, and made it clear to Mr. Allen that he would control every aspect of the project. In January 1982, just after he assumed office, the mayor organized a tour of the waterfront for all the dignitaries connected to the city, plaintiff was not invited to attend. The mayor stated that the exclusion of plaintiff from the tour was intended to signal the mayor's dominance in this area.

Allen continued to endeavor to be of assistance to the mayor; he apprised the mayor of the project's history, and informed the mayor that another potential source of income for the project existed— the § 108 loan program.[14] He explained to the mayor HUD's previous responses to the UDAG applications filed by the city, and suggested that HUD would be more favorably disposed to the waterfront project if it was scaled down. He further suggested that a less ambitious project would be more manageable. Though Mayor Martinelli initially opposed scaling down the project, by late 1982 he supported plaintiff's proposal.

Despite YWA's persistent failure to fulfill many of its obligations under the memorandum of understanding, Mayor Martinelli repeatedly extended the deadlines for YWA, as set forth in the memorandum of understanding. In plaintiff's opinion, the YWA had been given an adequate amount of time and opportunity to move the project forward and it was not in the city's interest to continue to grant YWA extensions to fulfill the terms of the memorandum of understanding. Though he voiced his concern, plaintiff took no formal position. Instead, the plaintiff, realizing that the mayor was content with YWA, endeavored to help the YWA fulfill certain of its obligations outlined in the memorandum of understanding.

Under the memorandum of understanding, the YWA was to prepare a site plan, the document on which the project would base an application for zoning changes. The memorandum of understanding specified that the site plan contain features required by city laws, such as: a zoning classification of the property, a description of property lines, locations and dimensions of existing and proposed streets, existing services in the area, topographic features of the area, maps showing city blocks and lots, and a "metes and bounds" description of the area. The site plan submitted by the YWA was reviewed by plaintiff and Planning Director Pistone; both found it lacking many of the features listed above. Despite these evaluations of the site plan the mayor insisted that the site plan was acceptable. Plaintiff asked YWA on three different occasions to submit a more appropriate plan. Finally, to insure that the YWA prepared an adequate site plan, the YCDA, under plaintiff's leadership, hired a surveyor to conduct the "metes and bounds" survey.

Plaintiff took other steps to provide assistance to the waterfront project. He provided information to the mayor and organized the city's role in furthering the project. He arranged for Mayor Martinelli to attend a meeting in June 1982 in Boston on waterfront development. Also in early 1982, he developed a schedule of the remaining outstanding steps that would need to be taken to complete the waterfront project and summarized sources of potential funding. After consulting with, among others, City Manager Prezioso and Mayor Martinelli, he had the YCDA perform various tasks outlined in the schedule.

In another attempt to assist the waterfront project, plaintiff encouraged the city manager to submit an environmental impact statement regarding the project to the

---

**14.** The § 108 loan program was instituted by the federal government in the 1970's (plaintiff had been involved in developing the loan program). It was administered by HUD to assist cities with the acquisition of land and with preparing the land for development. Under the § 108 program, a community could borrow three times its annual CDBG appropriation.

city council for its approval. He explained to City Manager Prezioso that in order for the project to qualify for federal funds, the city had to issue an environmental impact statement. Despite plaintiff's urging, no action was taken by the city manager concerning such a statement. Furthermore, the city manager never instructed plaintiff to take any action with respect to it.

Beginning in January 1982, Mr. Allen raised with the mayor the possibility that another source of funding could be tapped for the waterfront project. In July 1982, Mr. Allen, after learning from a HUD official that additional funds might be available and that applications were due on August 15, 1982, consulted with the mayor and took the necessary steps to apply for the funds. HUD had become aware of the city's interest in securing additional funds for the waterfront development as a result of many inquiries made by Mr. Allen. Thus as soon as funds became available, HUD notified Mr. Allen. In September of 1982, the New York area office of HUD advised Mr. Allen that the loan application had been favorably reviewed and forwarded to the Washington office.

In August 1982 a difference of opinion between Mr. Allen and Mayor Martinelli arose over whether several pieces of property within the waterfront redevelopment area known as "Buena Vista Properties," which were in substantial arrears in taxes, should be seized by the city through a sometimes Draconian expedited procedure known as *in rem* foreclosure for nonpayment of these taxes. Mayor Martinelli's position was that the foreclosure should be withheld if the taxes were paid. Mr. Allen's view was that the city should acquire these properties through *in rem* proceedings because such an acquisition would diminish the cost of acquiring properties for the waterfront project and because the city in its UDAG application had represented that these properties would be so acquired.

Corporation Counsel Edelman agreed with plaintiff that, given the representation in the UDAG application, the city should acquire the properties through *in rem* proceedings. The mayor asked the city council to allow the owners to pay the back taxes in exchange for the properties. While plaintiff did not support the mayor's request to the city council, he did not openly oppose it. The city council granted the mayor's application.

A disagreement of this type is normal among officials with responsibilities of any calibre; if silence were required, the ultimate employer would obviously suffer. Mr. Allen did not express affirmative public opposition to the mayoral view.

The interest of the city in acquiring property and deterring tax delinquency must obviously be balanced with its need to collect taxes if this is feasible, and to prevent abandonment of property that may remain useful to the citizenry, as well as to be fair as well as just to residents who may have experienced difficulty and have a right to appeal to whatever discretion the city may have in dealing with such matters. See generally *Friarton Estates Corp. v. City of New York,* 681 F.2d 150 (2d Cir.1982), *rev'g on res judicata grounds,* 525 F.Supp. 1250 (S.D.N.Y.1981) (containing further discussion of the procedure). Thus, the positions of both Mr. Allen and the mayor on this subject were reasonable.[15]

Early October, 1982, Mr. Allen attended meetings convened by the mayor concerning the waterfront project, the slow progress of which had attracted public attention. During the meeting of October 5, the mayor asked Mr. Rowe, an assistant of Dr. Prezioso, to become the waterfront project director; he also approved a scaled back version of the project.

The mayor, however, spent a large part of each meeting taking Mr. Allen to task for the waterfront project's lack of success. These complaints were pretextual and baseless. Inability of the developer to secure

---

**15.** Discharging Mr. Allen for disagreeing with the mayor on this subject—hardly at the core of the large-scale projects plaintiff was implementing at the direction of the city—would not be credible. The *in rem* affair was not a real reason—even when considered cumulatively with others—for plaintiff's dismissal.

funding constituted the central reason behind the waterfront project's failure. There was nothing that plaintiff, as director of the YCDA or as commissioner of DCD, could have done to help YWA secure firm financial commitments. The developer was solely responsible for that. The lack of progress of the waterfront project had become an embarrassment to the administration and attacks were directed at plaintiff to shift the blame. For at least four years after plaintiff's termination, there was little progress on the waterfront project.[16]

Another project on which Mr. Allen worked was the Southwest Community Center Project. This project was designed to rehabilitate the Southwest Community Center for use as a community center and a police precinct. A controversy involving the contractor on the project, Urbanex, had developed before plaintiff began working in Yonkers. Under a contract with YCDA, Urbanex was to be paid approximately $250,000. Contrary to custom, no performance bond had been required by YCDA from Urbanex. Moreover, Urbanex had secured a loan for $100,000 from Citibank for which YCDA put up the collateral with CDBG funds. Urbanex took out the loan in order to buy equipment and materials for the project. Approximately eight months later, before Mr. Allen was hired by the YCDA, Urbanex was terminated because it did not perform its duties properly. Urbanex defaulted on the loan and Citibank seized the collateral posted by YCDA. In its audit of 1980, HUD found the use of CDBG funds as collateral on a loan to a contractor to have been improper. It also found that YCDA's failure to negotiate a performance bond was not consistent with HUD's regulations.

When Mr. Allen became YCDA director, he received no instructions on this matter. He was informed that the issue of whether to file an insurance claim for the funds lost as a result of Urbanex's default was no longer in the hands of the YCDA, but was being addressed by City Manager Fox and Corporation Counsel Doran. To keep abreast of the Urbanex matter, plaintiff met several times with members of the corporation counsel's office. A determination by the corporation counsel's office concerning whether to file an insurance claim was delayed pending the outcome of an investigation by the Federal Bureau of Investigation into whether or not the actions of certain YCDA employees who had dealt with Urbanex amounted to criminal violations of the law. In August 1982, in response to inquiries by Dr. Prezioso, Mr. Allen sent Dr. Prezioso a memorandum setting forth the history of the Urbanex default. Mr. Allen was never directed by any member of the board to take any steps to secure indemnification for the moneys which had been pledged and lost prior to his tenure as director of the YCDA. Nor did he receive any criticism concerning the Urbanex matter from any members of the YCDA board.[17]

When Mr. Allen took the reins of the YCDA, the rehabilitation of the Southwest Community Center had come to a halt, because of Urbanex' default. One of Mr. Allen's responsibilities was to finish the rehabilitation of the facility. In 1981, the YCDA arranged for new contractors to develop the facility, and supervised the construction of the project. During plaintiff's tenure as director of the YCDA, the community center and police precinct were 95% completed. No one ever expressed any criticism of Mr. Allen concerning the completion of the Southwest Community Center Project. To the contrary, Dr. Prezioso and Police Chief Connally while on tours of the facility, both conveyed their great satis-

16. Once the scope of the project was redefined and divided into different phases, the first phase entailing the construction of a restaurant and office building, HUD approved a UDAG application for 1.5 million dollars.

17. I do not credit Dr. Prezioso's testimony that Corporation Counsel Edelman complained to him that Mr. Allen had failed to apply to the bonding company to replace the funds lost due to Urbanex. Mr. Edelman's testimony is to the contrary: he felt that Mr. Allen was probably not at fault with respect to the Urbanex matter. Nor do I credit Dr. Prezioso's testimony that he directed Mr. Allen to file an insurance claim.

faction with the outcome of the project.[18]

The Commerce Kitchen Project was another matter concerning which confusion arose. Shortly after Mr. Allen became director of the YCDA, he was directed by City Manager Fox to assist the Office of Aging, which had responsibility for the rehabilitation of a community kitchen located in the Commerce Building, to expedite the construction work so that the project would remain eligible for certain funding that the Office of Aging had secured. In response to the request, Mr. Allen provided the Office of Aging with a YCDA staff architect to design the kitchen and to draft contract documents. In addition, the YCDA monitored construction activity for the Office of the Aging.

In January or February 1982, the YCDA halted the construction of the project at the request of the acting City Manager because, according to him, the contractor was using the wrong type of tiles for the floor. Upon investigation, plaintiff learned that the contractor had been unable to secure the tile specified by the architect, but had secured an alternate tile that complied with the specifications outlined in the contract and which the architect for the Commerce Kitchen Project had approved. Accordingly, plaintiff made it possible for the contractor to continue the construction.

Ultimately the contractor finished the job; however, he threatened to sue YCDA for the delay caused by the halting of the construction. Mayor Martinelli and City Manager Prezioso were anxious for the matter to be resolved. Because YCDA had halted the job at the behest of the city, plaintiff felt that YCDA should have separate legal representation from the city concerning this matter. Plaintiff's suggestion regarding the retention of outside counsel was put to a vote by the YCDA board and was approved. No suit ever evolved and the matter was settled for the most part in approximately April 1982.

Questions were raised by the Martinelli and Prezioso administration as to whether the previous city manager should have directed YCDA to play such a significant role in a project of the Office of Aging. Plaintiff felt that since the Commerce Kitchen Project was within a target area, it was consistent with HUD's regulations for YCDA to lend its assistance to the project, even though it was not, technically speaking, a YCDA project. No one ever criticized plaintiff's handling of the project. Plaintiff cannot be faulted for any of his actions concerning the Commerce Kitchen project.

An issue over which Mr. Allen and Dr. Prezioso disagreed concerned the payment of a Con Edison bill for the library premises at the Howlands Building site for the period of June 1, 1981 through July 16, 1981. The YCDA had rehabilitated the Howlands Building in Yonkers for use as a library. After the building was renovated and occupied by the library an electricity bill amounting to approximately $10,000 was incurred. Though the lease for the library had been sent to the library in June 1981 when the library took control of the building, it was not returned and signed until January 1982. The lease was made effective as of July 16, 1981. Payment of the Con Edison bill by YCDA was inconsistent with HUD guidelines, which provided that YCDA should not pay the operational costs of community facilities in public works. In 1981 City Manager Fox directed the commissioner of fiscal services of Yonkers to pay the bill out of the city's operating funds. Despite this directive the bill remained outstanding.

In 1982 Dr. Prezioso, the successor city manager, directed Mr. Allen to pay the bill out of YCDA funds. Mr. Allen explained that such a payment was contrary to HUD rules. His characterization of the HUD regulations was confirmed in three letters from HUD, written in the summer of 1982, which stated that payment by YCDA of the utility expenses for the period in question was improper. Corporation Counsel Michael Edelman and Commissioner of Fiscal

---

**18.** I do not find Dr. Prezioso's testimony, to the effect that the progress on the project dragged under Mr. Allen's leadership, to be credible. It is refuted by Mr. Allen's testimony that he was able to explain, in specific terms, what steps he took to advance the project's progress.

Services Harold Peterson agreed with Mr. Allen that the bill should not be paid out of the YCDA budget. Dr. Prezioso continued to maintain that the bill should be paid by YCDA.

Ultimately, on September 20, 1982, the YCDA board voted to pay the bill from its funds. Messrs. Edelman and Peterson both voted against payment of the bill. Despite HUD's position, Mr. Allen followed the board's directive and paid the bill.[19]

### VIII.

The issue of low income housing was a hotly contested issue in Yonkers in 1981 and 1982. On this issue Mr. Allen took a view which differed from that of the administration. But the administration could and did override plaintiff on such policy points because he had no policymaking functions, power or authority, and the City might have retained him because of his professional expertise so long as he continued to carry out all assignments actually given him. But having a nonwhite in plaintiff's position at that particular time in Yonkers history itself was in and of itself troubling to the policy makers in Yonkers: the quality of plaintiff's performance, and the question of his intramural disagreements with anyone, or the lack of them, had relatively little significance.

Plaintiff believed that low income housing should be built on the east side of Yonkers in order to meet HUD requirements. This position was contrary to the position of the majority of the city council, who in 1981 voted to delete from the CDBG application a commitment to support scattered-site housing as well as § 8 based housing in areas with a substantial non-minority population. Despite Mr. Allen's difference of opinion, he did not refuse to carry out instructions given him and not having policymaking functions, he did not attempt to veto them.[20]

In the 1970's Yonkers had made a commitment to HUD to build subsidized housing in east Yonkers, and in 1980 HUD had required the city to submit an inventory of potential sites for such housing. This requirement was satisfied in part due to Mr. Allen's efforts.

In April 1981, HUD found only three of the sites to be suitable for the construction of housing: the Neustader Home, 1919 Central Park Avenue and School 4.

In the spring of 1981 a developer, which wished to construct a shopping center, successfully bid for the Neustader Home site. Mr. Allen did not oppose development of the site as a shopping center because he thought it would help ease the city's fiscal problems and because two sites remained on the inventory. HUD approved the removal of the Neustader Home site from the inventory.

The site at 1919 Central Park Avenue was not zoned for high density residential use, and the city council refused to change the zoning to make this site suitable for the development of low income housing.

The only remaining site in east Yonkers for subsidized housing was School 4. Thus it became the battleground for the controversy concerning the placement of subsidized housing in east Yonkers. In compliance with the HUD requirement the

---

**19.** In connection with the payment of this bill Mr. Allen executed a disclaimer, which stated:
The undersigned disclaims and does not certify, that the claim for payment by Con Edison in connection with an electric bill for electric charges associated with the Yonkers Public Library located at 517 Main Street, Yonkers, N.Y. for the period of 6/1/81–7/16/81 is an eligible expenditure under the CDBG Program. This claim is submitted at the direction and mandate of the YCDA and over objection of staff recommendation. . . . Thus, there are no representations made, nor may any be assumed, by the mere presentation of this claim for payment.

**20.** Accordingly on January 29, 1982, despite his personal views, Mr. Allen signed an affidavit in support of the city's defense to a law suit in this court charging it with racial discrimination, *United States v. Yonkers and the Yonkers Community Development Agency, et al.,* 80 Civ. 6761. He stated in that affidavit that low income housing should be built on the west side of Yonkers: "My studies of Yonkers' housing and urban renewal needs have demonstrated strikingly that the overriding need, by far, is the need for major rehabilitation of the decaying, even collapsing, buildings on the City's old, rundown west side."

YCDA, under Mr. Allen's leadership, attempted to solicit developers to develop subsidized housing at this site. In June 1982 the city council created a special citizens' committee to study the School 4 site and to make recommendations as to what the ultimate use of that site should be. Such a committee had never before been created to determine the use of city property. The five persons appointed as members of the citizens' committee were white and lived in the predominantly white neighborhood surrounding School 4. Only one of the persons on the citizens' committee had had any prior experience with development or zoning issues.

Mr. Allen was not consulted concerning the creation of the citizens' committee; he learned about it from a newspaper article. He promptly sent a memorandum to Dr. Prezioso and the corporation counsel reminding them that the School 4 site was the only site available with which Yonkers could fulfill its contractual obligation to HUD to build subsidized housing.

In September 1982 the citizens' committee recommended that the School 4 site be developed for luxury housing. On September 13, 1982, having received no response to his earlier memorandum, Mr. Allen notified the city manager and the mayor that such a use of the School 4 site would jeopardize the city's position with HUD.

He suggested that he and the corporation counsel should be consulted regarding the disposition of the School 4 site. The corporation counsel shared Mr. Allen's concern that School 4 not be sold to a luxury housing developer. Nevertheless, the citizens' committee continued to interview various luxury housing developers. After interviews with a few prospective developers, the committee recommended that Melvin Weintraub (principal of YWA) be permitted to develop luxury condominiums on the School 4 site.[21]

The court takes judicial notice of the findings in *United States v. Yonkers Board of Education*, 624 F.Supp. 1276, 1363 (S.D.N.Y.1985), *aff'd*, 837 F.2d 1181 (2nd Cir.1987), *cert. denied*, 486 U.S. 1055, 108 S.Ct. 2821, 100 L.Ed.2d 922 (1988) that:

"... attempted sale [of School 4 for development of luxury housing] was not a routine and race neutral disposition of surplus property, but an effort to ensure that the site could not be used for the construction of subsidized housing in East Yonkers. As such, it reflects a clear intent on the part of city officials to continue the thirty year pattern of discriminatory action that has operated to exclude subsidized housing for families from East and Northwest Yonkers." 624 F.Supp. at 1363.[22]

When Mayor Martinelli took office, an issue arose concerning a former employee

21. In December 1982, after Mr. Allen had been discharged, the city council voted 11–2 to allow Mr. Weintraub to buy the School 4 site. Prior to the city council vote, city council members sent a notice to all community residents alerting them to the fact that the NAACP was opposing the development of School 4 as luxury housing and urging their attendance at a community meeting on the issue.

22. In the midst of trial the plaintiff urged the court to take judicial notice of the findings in *United States v. Yonkers Board of Education*, 624 F.Supp. 1276 (S.D.N.Y.1985), *aff'd*, 837 F.2d 1181 (2d Cir.1987) *cert. denied*, 486 U.S. 1055, 108 S.Ct. 2821, 100 L.Ed.2d 922 (1988), which determined that from 1949 through 1982 Yonkers had intentionally segregated its housing. There is support in case law for taking judicial notice of court records, findings and decisions. *See e.g., Shuttlesworth v. Birmingham*, 394 U.S. 147, 157, 89 S.Ct. 935, 942, 22 L.Ed.2d 162 (1969) (judicial notice of the record in a related

case between same parties); *Jacques v. R.R. Retirement Bd.*, 736 F.2d 34, 40 (2d Cir.1984); *First Federal Sav. Bank v. Tazzia*, 696 F.Supp. 904, 909 (S.D.N.Y.1988) (court took judicial notice of a sworn statement that had been submitted in another group of lawsuits before the court); *Deshmukh v. Cook*, 630 F.Supp. 956, 960 (S.D.N.Y.1986) (recognition that may take judicial notice of findings in other cases). Two defendants in this action, the city of Yonkers and the YCDA, were also defendants in the action before Judge Sand. There can be no claim that those defendants in that action lacked a full and fair opportunity to litigate the facts and issues.

Defendants object to this court taking judicial notice of the findings made in the action before Judge Sand on the ground that the decision of Judge Sand was not final. This objection overlooks the detailed and thorough nature of Judge Sand's findings, made after a lengthy trial, which were affirmed by the Second Circuit at 801 F.2d 593 (1986).

of the YCDA, Thomas Cleary. In 1980, when Mr. Allen began working at YCDA, Mr. Cleary was employed by the YCDA to work in the area of economic development. In the latter part of 1981 Mr. Cleary was terminated from YCDA because of cut backs in the administrative budget of the YCDA, and because three consecutive job performance evaluations conducted at six month intervals by Mr. Allen found Mr. Cleary's work to be unsatisfactory. Additionally, Mr. Cleary had made racial slurs about Mr. Allen in his presence.

In January 1982, at a meeting with Mayor Martinelli, plaintiff was directed to rehire Mr. Cleary. Mr. Allen advised the mayor of his reasons for firing Mr. Cleary and that he did not want to rehire him. He suggested that the mayor's office hire Mr. Cleary. The following day, Mr. Allen was notified by the mayor that the mayor's office would hire Mr. Cleary to work on economic development projects: the mayor directed Mr. Allen to find funds within the YCDA budget to pay Mr. Cleary's salary. Mr. Allen informed the mayor that such an arrangement would be inconsistent with HUD regulations unless he received monthly status reports from Mr. Cleary, which demonstrated that Mr. Cleary's work had a direct relationship to the functions of YCDA. With the understanding that he would receive such reports, Mr. Cleary was hired.

Several months passed, during which Mr. Allen received no status reports from Mr. Cleary. After inquiry to Mr. Cleary's supervisor in the mayor's office, to which he received no response, plaintiff sent a memorandum to the mayor indicating that he had not received the necessary reports from Mr. Cleary. Mayor Martinelli responded that he would take care of it. After several months had passed, in which Mr. Allen still received no status reports, he sent a memorandum to the city manager indicating that he did not want Mr. Cleary to be paid with YCDA funds. Despite Mr. Allen's memorandum, Mr. Cleary was paid after intercessions on his behalf were made by the mayor's office. Ultimately, Mr. Allen did receive some status reports, of minimal quality and content. Mr. Cleary remained on the YCDA payroll throughout the remainder of Mr. Allen's tenure as director.

## IX.

By the summer of 1982, relations between the plaintiff on the one hand, and Mayor Martinelli and City Manager Prezioso on the other, had deteriorated.

On October 8, 1982 City Manager Prezioso informed plaintiff that he was discharging him from the position of commissioner of DCD and recommending his discharge from the position of director of YCDA effective October 22, 1982. City Manager Prezioso stated that this action was necessitated by policy differences between plaintiff and the city council. Allen responded that he did not make policy but only administered the DCD and YCDA consistently with the policies set by the city manager and the YCDA board.

City Manager Prezioso sent a memorandum dated October 12, 1982, to YCDA board members listing reasons why plaintiff should be terminated from the employ of the board:

I am requesting that the Yonkers Community Development Agency Board meet in Executive Session at the earliest possible date to discuss the actions taken by the City Manager in reference to Mr. Allen's functions both as Commissioner [of the City of Yonkers Department of Community Development] and Director of the Yonkers Community Development Agency. I have dismissed Mr. Allen as Commissioner effective October 22, 1982. Further, I am recommending that he also be dismissed as Director of the Yonkers Community Development Agency and that appropriate terms be made to give him his due vacation time and some relocation time.

As I have explained to Mr. Allen, the reason for the severance of our professional relationship has to do with our basic and fundamental differences in policy implementation and management of Agency affairs.

More specifically, let me state that I have found it difficult to comprehend Mr. Allen's verbal communications which are seemingly predestined to confuse us. His continuance of flooding us with a mass of memorandum to cover up on matters which he had been assigned to attend to and numerous excuses and the continual reign of confusion, have made it difficult for me to continue my working relationship with him.

Plaintiff responded to these charges in a memorandum to the YCDA board members dated October 14, 1982. Mr. Allen's memorandum refuted each incident mentioned in Dr. Prezioso's memorandum and concluded, "I suggest to you, that my proposed termination by the City Manager is based merely on expedient politics and should be viewed as such."

On October 14, 1982 the YCDA board met to consider Mr. Allen's termination. There was no discussion of the allegations contained in Dr. Prezioso's memorandum or of the responses contained in Mr. Allen's memorandum. At the meeting, Comptroller Harold Peterson moved that the YCDA approve a resolution to terminate Wilbert Allen as director of the agency. The resolution was approved by a majority vote. With the exception of Mayor Martinelli, the board members had had relatively little contact with Mr. Allen and little familiarity with the issues touched upon in Dr. Prezioso's memorandum. Some members may have simply honored the recommendation of the city manager who, they may have assumed, knew the facts.

Whatever the members' individual thinking or separate reasons for voting as they did, which cannot be determined with reliability as to the members taken separately, the action of these ultimate decisionmakers as a body was decisively influenced by Mr. Allen's race at a time when his ethnicity was unpopular in the context of a locally unpopular national housing policy. The City of Yonkers is bound by the overall unconstitutional motivation of these actions even though probing beneath the action of the board as an ultimate decisionmaking body to assay separate independent motivation of the individual members would in this instance be akin to attempting to trace subatomic particles with an ordinary magnifying glass.[23]

Mr. Allen left his positions in the city on October 22, 1982. He was succeeded by Joseph Seymour, who is white. Mr. Seymour became YCDA director and commissioner of DCD in January 1983, at a yearly salary of $47,775. Mr. Seymour had previously worked in the city of Peekskill's development department but had qualifications which on an overall basis were inferior to those of plaintiff. A severance agreement between the YCDA and Mr. Seymour provided for him to be paid six months salary upon his termination, a practice followed in other instances in Yonkers, but a benefit—important as it turned out—never offered to plaintiff.[24]

---

23. An idea of the fluidity and complexity of factors entering or potentially entering into individual votes is illustrated by testimony (obviously hearsay and hence which I do not rely upon for its truth) that some of the board members had previously heard the city manager characterize Mr. Allen as long-winded and giving double-talk, leaving the court to other evidence to determine why the manager may have said this if he did. Ms. Kleine according to some evidence voted for termination because she felt it was consistent with the wishes of Dr. Prezioso. Michael Edelman's vote was purportedly based not only on his feeling that the mayor and city manager should have someone as director with whom they could work, but also on his own perception that Mr. Allen was a poor administrator. Although I have concluded that all of the purported explanations for adverse action as to plaintiff to be pretextual, I cannot determine the extent to which a particular board member did or did not believe the pretexts, perhaps because of what that member may have been told by the mayor or city manager. For example, one of the board members, Harold Peterson, who voted for termination of Mr. Allen, opined at deposition that he was doing a fine job as YCDA director, which fails to illumine the individual reasons for his vote.

24. The device of a severance agreement has been used in Yonkers to attract persons to other posts in city government. In 1983 both Peter Davidson, as corporation counsel, and John Gann, as director of Management Information Systems, were extended severance agreements. Dr. Prezioso was awarded a severance agreement by the city council in 1982.

As a result of the impact of the termination, Mr. Allen did not seek work for approximately a year. In November 1983, plaintiff became a general partner in a limited partnership involved in real estate development. The partnership was successful in launching a 21 unit town-house project in East Orange, New Jersey, which became a model project for New Jersey. While Mr. Allen was solely responsible for conceiving and administering the project, his limited partner provided the financial backing for the project.[25]

## X.

### A. Discrimination claims.

■ Plaintiff asserts a disparate treatment claim[26] under Title VII of the Civil Rights Act of 1964, which prohibits discrimination on the basis of race by an employer. 42 U.S.C. § 2000e–2. Plaintiff has also asserted claims pursuant to 42 U.S.C. § 1981 and 42 U.S.C. § 1983, which may be invoked to seek remedies for racial discrimination in employment. See *Patterson v. McLean Credit Union*, 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989).

Neither party has asked the court to give retroactive effect to any changes made by the Civil Rights Act of 1991; the court thus analyzes plaintiff's claims based on the law extant during the period of the events in question.

The individual claims set forth in the complaint are viewed in the light of the following overall finding:

Race was the controlling negative factor in unfavorable aspects of plaintiff's treatment throughout his relationship with the institutional defendants, including absence of severance pay provisions in his contract and his dismissal, while any claimed defi-

ciencies in plaintiff's performance were not factors and were pretextual. Plaintiff's qualifications and performance were outstanding. Plaintiff never refused to follow clear instructions by municipal policymakers. Policy differences were not a significant reason for dismissal (and were nonexistent at the time of contracting).

Plaintiff's race, regardless of his performance or individual views, identified him in the minds of the decisionmakers of the institutional defendants, with the overall national policies with which those decisionmakers disagreed (or at the time of the contract realized they might come to disagree), thus making plaintiff a target for adverse treatment and ultimately for dismissal for that reason.

This is contrary to the Constitution and federal statutes; otherwise, any individual member of a group which, *qua* group is perceived to have become involved in controversy can be discriminated against because that individual is tagged with overall attitudes rather than being considered on individual merits as required by the Constitution and implementing statutes.

### 1. *42 U.S.C. § 1981.*

■ The Supreme Court has limited the scope of claims under § 1981 based on discrimination in an employment context to claims arising from the making of employment contracts as distinguished from claims arising from the breach of such contracts. As of the time of the events in dispute, at least, the statute prohibited, when based on race, the refusal to enter into a contract except only on discriminatory terms. But the right to make contracts did not extend as a matter of either logic or semantics, to conduct by the employer after the contract relation has been estab-

---

**25.** Mr. Allen asserts that had he not been discharged in October 1982, he would not have needed the financial support of his limited partner, and could have retained the $200,000 of profit which his limited partner received.

**26.** Disparate treatment occurs when the employer treats an individual less favorably than others because of his race, religion or sex. A disparate impact case involves a practice which is facially neutral, but in fact affects one group more

harshly than another. Proof of discriminatory motive is essential in a disparate treatment case, and is not necessary in a disparate impact case. *Teamsters v. United States*, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977); *see, Watson v. Forth Worth Bank and Trust*, 487 U.S. 977, 986–87, 108 S.Ct. 2777, 2784, 101 L.Ed.2d 827 (1988); *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253–54, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981).

lished, including breach of the terms of the contract. *General Building Contractors v. Pennsylvania*, 458 U.S. 375, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982); *Krulik v. Board of Education of City of New York*, 781 F.2d 15, 23 (2d Cir.1986).

Plaintiff was never offered severance pay either at the time of the entry into the contract, or for that matter when dismissed. In this important respect, the initial contractual relationships at their inception differed as to plaintiff and nonminority applicants and incumbents, a disparity especially striking in view of plaintiff's high qualifications (see footnote 24 *supra*). Similarly, plaintiff was not offered severance pay when dismissed. While later applicants for plaintiff's position may have had to confront difficulties, plaintiff likewise had to deal with an unstable situation involving impending adverse federal actions against the city and its housing agencies for which plaintiff could have been blamed had they became a reality, with potentially ruinous effects on his career.

Failure to offer severance pay at the time of plaintiff's discharge, as well as in the original contract, and offer of severance pay to plaintiff's successor as well as to others, constitute pertinent evidence of disparity at the time of the original contract, because later conduct often sheds light on earlier behavior. See *Eatz v. DME Unit of Local No. 3*, 794 F.2d 29 (2d Cir. 1986); *United States v. Ramirez*, 894 F.2d 565, 569 (2d Cir.1990); *Phoenix Canada Oil Co. v. Texaco*, 842 F.2d 1466, 1478 (3d Cir.1988). Patterns of conduct are, indeed, highly relevant generally. See *Culli v. Marathon Petroleum*, 862 F.2d 119, 125–26 (7th Cir.1988).

The authorized policymaking and decisionmaking authorities of the institutional defendants must be viewed as continuing entities in this regard, just as corporations do not lose responsibility for decisions of top management because of changes of personnel in those roles. Taking the conduct of the institutional defendants as entities and viewing it as a whole over the relatively short time covered by the events involved in this case, contractual discrimination by those defendants at the time of plaintiff's contract in violation of 42 U.S.C. § 1981 has been shown. I find these institutional defendants, but no individual defendants, liable under that statute (see also discussion in Part II above).

### 2. *42 U.S.C. §§ 1983 and 2000e.*

■■■ A plaintiff proceeding under Title VII or § 1983 must prove discriminatory intent. *See Gibbs v. Consolidated Edison Co. of New York, Inc.*, 714 F.Supp. 85, 93 (S.D.N.Y.1989); *Richards v. New York City Board of Education*, 668 F.Supp. 259, 264 (S.D.N.Y.1987), *aff'd mem.*, 842 F.2d 1288 (2d Cir.1988). *See e.g., Martin v. Citibank*, 762 F.2d 212 (2nd Cir.1985).

Section 1983 requires the plaintiff to prove not only that the defendant has purposefully discriminated against him, but also that the defendant was acting under color of state law. *Knight v. Nassau County Civil Service Commission*, 714 F.2d 114 (2d Cir.1982). Plaintiff has shown that defendants' actions were under color of state law within the meaning of § 1983.[27]

Since the Title VII and § 1983 claims involve the same factual allegations and must be evaluated under the same legal standard for the purpose of determining whether plaintiff's discharge was the product of racial discrimination, these claims will be discussed together.[28]

---

**27.** He has met the burden set forth in *Monell v. Department of Social Services*, 436 U.S. 658, 690, 98 S.Ct. 2018, 2035, 56 L.Ed.2d 611 (1978). The city of Yonkers and YCDA are local instrumentalities of a state, and their authorized policymakers for those instrumentalities in terminating his employment. They were, therefore, acting under color of state law, and the termination decisions were made by officials having the final authority for such decisions. *Saint Louis v. Paprotnik*, 485 U.S. 112, 108 S.Ct. 915,

99 L.Ed.2d 107 (1988); *Villante v. Dept. of Corrections of City of New York*, 786 F.2d 516, 519 (2d Cir.1986); *Pembaur v. Cincinnati*, 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986); *Krulik v. Board of Education*, 781 F.2d 15, 23 (2d Cir.1986); *Rookard v. Health and Hospitals Corporation*, 710 F.2d 41, 45 (2d Cir.1983).

**28.** The detailed factual background is set forth in parts I through VII above, and the specific finding as to discriminatory intent activating

702

### (i) *Coverage of plaintiff's position*

 I address a threshold question with respect to plaintiff's Title VII claim: whether or not plaintiff as director of the YCDA or as commissioner of DCD was an "employee" within the meaning of Title VII, 42 U.S.C. § 2000e–2.

Subsection (f) of § 2000e limits the definition of employee:

> The term employee shall not include any person elected to public office in any state or political subdivision thereof, or any person chosen by such officer to be on such officer's personal staff, or an appointee on the policy making level or an immediate advisor with respect to the exercise of the Constitutional or legal powers of the office.

The House and Senate Conference Committee report explains the purpose behind subsection (f), which became law in 1972, eight years after Title VII was originally enacted: subsection (f) was enacted "to exempt ... persons appointed by ... elected officials as advisors or to policy making positions at the highest levels of the departments or agencies of state or local governments such as cabinet officers, and persons with comparable responsibilities at the local level...." 1972 U.S.Code Cong. & Admin.News 2137, 2180. Congress intended that "this exemption be construed narrowly." *Id.*

As applied here, this legislative history is in accord with the plain language of the statute. As commissioner of DCD plaintiff was appointed by the city manager, who is not an elected official in Yonkers: as director of YCDA plaintiff was appointed by the board of YCDA only one out of seven of whom was an elected official. Since the Section 2000e(f) exemption applies only to appointees of elected officials, whether as advisors or as department heads, literally read it does not apply to plaintiff.[29] The policy underlying the exemption must, however, also be considered in interpreting its provisions; this policy would appear to treat as an employee covered by the statute rather than exempted one who implemented but did not make policy.

I credit plaintiff's testimony that his position did not call for policymaking and that he considered this to be the province of higher officials during the performance of his duties; otherwise the events described above would, indeed, have played out quite differently. No credible evidence to the contrary was offered.

Subordinate to the city manager and not directly appointed by an elected official, plaintiff would hardly be considered to be comparable to a cabinet officer or policymaker.

Plaintiff was an employee within the meaning of that term in 42 U.S.C. § 2000e both as commissioner of DCD and as director of YCDA and not exempt.

### (ii) *Discrimination*

The rule allocating the shifting burden of proof in a Title VII disparate treatment case can be gleaned from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).[30] While the pattern set forth in *McDonnell Douglas* has primary application in a pre-trial motion-to-dismiss, or summary-judgment setting, it furnishes useful analytical guidelines even when a trial has been had.

 The plaintiff bears the initial burden of showing a prima facie case of discrimination. The burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the employee's discharge. If the defendant is able to articulate such a reason, the plaintiff must show that the stated reason was a mere pretext for discrimination. The ultimate burden of persuasion remains with the

---

the relevant treatment of plaintiff is set forth at the beginning of this section VIII.

**29.** There is no exemption applicable to 42 U.S.C. § 1983 which corresponds to the Title VII exemption under 42 U.S.C. § 2000e(f).

**30.** *McDonnell Douglas* was the only case cited in plaintiff's trial memorandum and proposed findings of fact and conclusions of law. Defendants' papers cited no case.

plaintiff, who I treat as required to persuade the court by a preponderance of the evidence that he has been the victim of discrimination because of race, and would not have been treated in the same unfavorable way had the person's ethnicity been different.[31]

Two assumptions underlie the three stage analysis set forth in *McDonnell Douglas:* one, that employers do not make business decisions randomly, without a reason; and two, that "when all valid nondiscriminatory business reasons for the decision have been eliminated, common experience with employment discrimination suggests it is likely that the decision was based on unlawful considerations." *Dister v. The Continental Group,* 859 F.2d 1108, 1111 (2d Cir.1988) (*citing Furnco Construction Corporation v. Waters,* 438 U.S. 567, 576, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978)).

### (a) *Prima Facie Case*

■■■■ In order to prove a prima facie case of discrimination a plaintiff must prove the following four elements: (1) membership in a potentially unfavorably treated minority; (2) satisfactory job performance; (3) dismissal; and (4) that after dismissal, the position remained open and defendants continued to seek applications from persons with qualifications similar to those of plaintiff. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824.

There is no dispute regarding Mr. Allen's race, that he was discharged and that a successor was hired. Plaintiff's job performance as described above was highly satisfactory. He brought a varied background in the field of urban planning to the Yonkers' posts consisting of both academic training and on-the-job training. Before assuming his positions in Yonkers, he was highly familiar with urban development in

general and with HUD's programs and regulations in particular.

■■■■ One's qualifications, however, serve only to equip one to perform satisfactorily. They cannot, in and of themselves, constitute satisfactory performance. In *Meiri v. Dacon,* 759 F.2d 989 (2d Cir.1985), *cert. denied,* 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985), the Second Circuit suggested that in determining if a plaintiff has made the requisite showing of satisfactory performance, the court must consider not only his qualifications, but also whether his actual performance measured up to the legitimate expectations of his employers. "[w]hen determining whether an employee's job performance is satisfactory ... the ultimate inquiry is whether an employee's performance 'meets his employer's legitimate expectations.' " *Meiri v. Dacon,* 759 F.2d at 995 (*citing Huhn v. Koehring Co.,* 718 F.2d 239, 244 (7th Cir.1983); *Thermidor v. Beth Israel Medical Center,* 683 F.Supp. 403, 413 (S.D.N.Y.1988)).

In *United States Postal Services Board of Governors v. Aikens,* 460 U.S. 711, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983), the Supreme Court noted that a Title VII plaintiff's initial burden is not onerous and that courts should not be preoccupied with whether or not a prima facie case has been established. Plaintiff as a part of his direct case made a more-than-adequate showing of highly professional and satisfactory performance, thus satisfying the second *McDonnell Douglas* element.

With respect to the fourth *McDonnell Douglas* element, while Mr. Seymour's qualifications for the post of YCDA director may have been adequate, there is no showing in the evidence before me that they were superior to those of Mr. Allen.

### (b) *Absence of Legitimate Reasons for Adverse Treatment*

■■■■ Once the plaintiff has established a prima facie case a rebuttable presumption

---

**31.** Defendants would not have made the same decision had plaintiff been of different ethnicity, because in that event he would not have been a symbol or focus for disagreement with national housing policy under the circumstances then existing in Yonkers.

A competent person such as plaintiff who obeyed instructions concerning actual steps he was to take and did not make an open public issue of any disagreements with policymakers would not have been dismissed—this would merely have added additional problems to a municipality which did not need them and would not have wished to incur them.

arises that the employer unlawfully discriminated against the employee. It then up to the defendants to rebut that presumption by showing evidence of a legitimate, non-discriminatory reason for its actions. The Supreme Court in *Board of Trustees of Keene State College v. Sweeney*, 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978) explained that all that an employer is required to do in order to rebut the plaintiff's prima facie case is to "articulate some legitimate, non-discriminatory reason" for its firing of plaintiff. 439 U.S. at 25, 99 S.Ct. at 295. The burden on defendant is not a burden of persuasion; it is merely a burden of production. The defendant rebuts the presumption of discrimination if it produces evidence that raises a genuine issue of fact as to whether it discriminated against plaintiff. *Id.*

 Under *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), defendants may accomplish this by producing evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus:

> First, ... the defendant's explanation of its legitimate reasons must be clear and reasonably specific.... Second, although the defendant does not bear a formal burden of persuasion, the defendant nevertheless retains an incentive to persuade the trier of fact that the employment decision was lawful.

*Burdine*, 450 U.S. at 248, 258, 101 S.Ct. at 1089, 1096. The reasons articulated by the defendant must be clear and specific so that the plaintiff is provided with a fair opportunity to show that they are not the true reasons for the employer's action. *Burdine*, 450 U.S. at 254–56, 101 S.Ct. at 1094–95. *See Meiri v. Dacon*, 759 F.2d 989, 997 (2d Cir.1985); *Sweeney v. Research Foundation of State Univ. of New York*, 711 F.2d 1179, 1185 (2d Cir.1983); *Loeb v. Textron*, 600 F.2d 1003, 1012 n. 5

(1st Cir.1979). *See, i.e., Ibrahim v. New York State Department of Health*, 904 F.2d 161, 167 (2d Cir.1990).

 Subjective evaluations must be scrutinized carefully by the court because they may mask prohibited prejudice. *Sweeney v. Research Foundation of State Univ. of New York*, 711 F.2d 1179, 1185 (2d Cir.1983) (citing *Knight v. Nassau County Civil Service Commission*, 649 F.2d 157, 161 (2d Cir.), *cert. denied*, 454 U.S. 818, 102 S.Ct. 97, 70 L.Ed.2d 87 (1981). *See Gibson v. American Broadcasting Companies, Inc.*, 892 F.2d 1128, 1133 (2d Cir.1989); *Haskell v. Kaman Corp.*, 743 F.2d 113, 121 (2d Cir.1984); *Coble v. Hot Springs School District No. 6*, 682 F.2d 721, 726–27 (8th Cir.1982); *Crawford v. Western Electric Co.*, 614 F.2d 1300, 1313–17 (5th Cir.1980); *United States v. N.L. Industries*, 479 F.2d 354, 372 (8th Cir.1973); *compare, Stanojev v. Ebasco Services, Inc.*, 643 F.2d 914, 921–22 (2d Cir.1981) (subjective business reasons alone are sufficient basis for firing employee under *McDonnell Douglas* ).

Where an employee is in a supervisory position, however, the employer may rely on subjective criteria to a greater extent. *Lieberman v. Gant*, 630 F.2d 60, 67 (2d Cir.1980); *Estepa v. Shad*, 652 F.Supp. 567, 571 n. 8 (E.D.N.Y.1987). Employment decisions concerning higher echelon jobs may turn on qualities which do not lend themselves to objective tests. *See Mason v. Continental Illinois National Bank*, 704 F.2d 361, 365–66 (7th Cir.1983); *Loeb v. Textron*, 600 F.2d 1003, 1017 n. 8 (1st Cir. 1979); *Tolliver v. Community Action Commission to Help the Economy*, 613 F.Supp. 1070 (S.D.N.Y.1985).

 In this realm, however, I have found plaintiff's testimony to be credible[32] but the defense testimony vague and illogical and not to be credible. While plaintiff was characterized as being uncooperative, I find that he did everything he was actually asked to do and kept his policy views out of the public domain. He would certainly not

---

32. In a Title VII case a defendant may meet its burden under *McDonnell Douglas* by cross-examining plaintiff's witnesses. *See, e.g., Lieberman v. Gant*, 630 F.2d 60, 65 n. 8 (2d Cir.1980)

(citing *Sime v. Trustees of California State University & Colleges*, 526 F.2d 1112, 1114 (9th Cir.1975)).

have been discharged—the institutional defendants and their ultimate policymakers did not, at the time, need another controversy—but for the fact that his race made him a symbol for a national policy that had become locally unpopular. To permit discharge on such a basis would mean that any citizen can become vulnerable to discrimination if that person's ethnic group becomes unpopular for reasons beyond the control of the citizen—clearly not intended to be allowed under our civil rights laws.

The October 12, 1982 memorandum authored by Dr. Prezioso lists what I find to be pretextual reasons for plaintiff's discharge. At trial both Mr. Martinelli and Dr. Prezioso elaborated on the reasons for the discharge listed in the October 12, 1982 memorandum. Their elaborations were also pretextual. Mr. Martinelli testified that Mr. Allen had personal conflicts with private individuals involved in the waterfront project, and that he did not inform members of the board about potential sources of funding for the waterfront project, such as § 108 funds. Mr. Martinelli also charged that plaintiff lacked enthusiasm for the waterfront project. In addition, Mr. Martinelli had a vague recollection that there had been some question in 1982 concerning Mr. Allen's management of the Commerce Kitchen project, although he could not recall the details; he conceded that there was never any finding that Mr. Allen acted improperly. At trial Mr. Martinelli also mentioned Urbanex as a controversial issue, about which, however, he never criticized plaintiff. In sum, Mayor Martinelli's major complaints were that Mr. Allen had a poor attitude toward the waterfront project, and that he was reluctant to become a member of the "team" which Mr. Martinelli's administration was forming.

Dr. Prezioso cited at trial the controversy concerning Con Edison's bill to the library as a reason for the firing. He blamed Mr. Allen for changing his advice concerning payment of the bill and for making the matter a "cause célebre." He also faulted Mr. Allen for not applying to a bonding company to recover funds lost due to the Urbanex incident, and he suggested that Mr. Allen had not provided him with a copy

of the 1980 HUD audit which contained the findings concerning Urbanex. Additionally, he charged that a delay in the Southwest Community Center was in some way the fault of Mr. Allen, to whom the slow pace of the waterfront project was attributable because he did not provide necessary leadership. While Dr. Prezioso conceded that Mr. Allen took steps to insure that an appropriate site plan was forthcoming and to secure § 108 funds so that the waterfront project could proceed, he criticized Mr. Allen for not formulating recommendations for the project and for not cooperating with the mayor and his those of his assistants who were working on the project. Finally, he claimed that Mr. Allen exerted no control over the management of the DCD: when he raised this with Mr. Allen, the response he received was that the problem lay in the fact that the DCD employees were civil servants. Dr. Prezioso further asserted that as a result of the poor management of the DCD by Mr. Allen, there were complaints concerning the housing inspections performed by the department of housing. Dr. Prezioso repeated at trial his complaints concerning Mr. Allen's tendency to be long winded and to change his position on various issues, and concerning his poor management style.

The testimony of Mr. Martinelli and Dr. Prezioso concerning Mr. Allen's attitude and working habits was general, vague and non-objective. Dr. Prezioso was not able to provide the court with one specific subject concerning which Mr. Allen had changed his position, or concerning which his verbal communications "were seemingly predestined to confuse." Nor was Dr. Prezioso able to recall a specific instance where Mr. Allen, having originally agreed on a response to an issue, later "flooded the Board of Directors with memoranda" which reflected a change in his position. Mayor Martinelli's testimony concerning Mr. Allen's uncooperative attitude, and his observation that Mr. Allen "did not seem to want to be part of the team that we were forming there," were similarly devoid of any specifics or factual support.

### (c) *Showing of Pretext or Discriminatory Reason*

The proffer of vague and nonobjective observations as the bases for discharging Mr. Allen presents the problem with which the Second Circuit was concerned in *Sweeney,* 711 F.2d at 1185, and which the Supreme Court recognized in *Burdine,* 450 U.S. at 254–56, 101 S.Ct. at 1094–95. The vague nature of these criticisms makes it difficult for a plaintiff to refute them. I have concluded, after comparing the laundry lists of purported weaknesses in plaintiff's performance to his actual record that they are pretextual, and that the actual reason that Mr. Allen was discharged is because he was black.

■ Pursuant to the framework set out in *McDonnell Douglas,* if the employer has articulated a non-discriminatory reason for the discharge, the employee has the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against him. "However, this ultimate burden is in effect narrowed once the employer has set forth its proffered reasons for its actions, and the plaintiff may focus on 'specific reasons advanced by the employer' " *Sweeney v. Research Foundation,* 711 F.2d at 1186 (citing *Wright v. National Archives and Records Service,* 609 F.2d 702, 716 (4th Cir.1979)). A plaintiff may satisfy this ultimate burden in one of two ways: "[e]ither directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine, supra,* 450 U.S. at 256, 101 S.Ct. at 1095; *Ibrahim v. New York State Dept. of Health,* 904 F.2d 161, 167 (2d Cir.1990).

■ In this case, for the reasons given above, I do not find the reasons given for plaintiff's dismissal real or substantive, but rather merely excuses and pretexts. Moreover, I find that the racial factor as described above is the more likely reason for the actions of the institutional defendants. See *Lieberman v. Gant,* 630 F.2d 60, 65 (2d Cir.1980). The more questionable the employer's reasons, the more susceptible they are to recognition as pretext. *Dister* at 1116. The more unreasonable or arbitrary the employer's reasons, the less likely it is that the court will find that the reasons given for the discharge were honestly and sincerely held.

I reject the defendants' claim that Mr. Allen was discharged because of his management of §§ 8 and 23 programs or his securing of § 108 funds. Neither Dr. Prezioso nor Mayor Martinelli provided concrete illustrations to justify their general criticisms of Mr. Allen in these areas. They were unable even to describe the §§ 8 and 23 programs. When asked during the trial to explain Mr. Allen's failings in administering the §§ 8 and 23 programs, Dr. Prezioso stated, "I can't get into that at this time." Mayor Martinelli admitted that he did not know of complaints concerning the management of these programs.

Similarly, I find that the complaints of Dr. Prezioso and Mayor Martinelli pertaining to Mr. Allen's securing of § 108 funds for the waterfront project to be incredible. Dr. Prezioso could not explain what § 108 funding was; neither he nor Mayor Martinelli knew that § 108 funds first became available to cities such as Yonkers in July 1982, the month that Mr. Allen undertook the necessary steps to secure such funds. While defendants did not have the burden of persuading me of their legitimate reasons for terminating plaintiff, the fact that defendants' witnesses had very limited, or no, familiarity with the reasons they have articulated to justify the dismissal spells pretext.

Defendants' criticism of plaintiff's management style lacks a basis in fact. Plaintiff was an able administrator of both the YCDA and DCD. Defendants highlighted the disingenuousness of their criticism of plaintiff's administration of the YCDA by their inability to reconcile their criticism with HUD's praise of plaintiff's administration, together with their admission that in October of 1982 they knew of HUD's positive evaluation. Prior to October 12, 1982, no complaint had been made by any of the defendants concerning Mr. Allen's adminis-

tration of the DCD, and at the trial before me defendants were unable to particularize their criticism. I conclude that their complaints as to Mr. Allen's administrative abilities, as to his attitude, are pretextual.[33] Nor are the general assertions by defendants about plaintiff's attitude borne out by the facts.

There is no basis for defendants' criticism of Mr. Allen's performance relating to Urbanex's default and the Southwest Community Center project.[34] Mr. Allen is not to blame for the money lost as a result of the contractor's default. As previously noted, I reject Dr. Prezioso's statement that he directed Mr. Allen to file an insurance claim concerning Urbanex after Mr. Edelman complained that Mr. Allen had neglected to file such a claim; it is inconsistent with Mr. Edelman's deposition testimony that Mr. Allen was probably not at fault with respect to the Urbanex matter. The testimony of Dr. Prezioso and Mr. Martinelli that they were concerned about Mr. Allen's inaction regarding the Urbanex issue is further discredited by their admission that they never sought any information about what steps, if any, had already been taken by the city regarding the filing of an insurance claim.

Nor can Mr. Allen's contribution to the completion of the Southwest Community Center be refuted. Plaintiff's efforts rescued this project, which had been derailed due to the contractor's default prior to his arrival at the YCDA. Dr. Prezioso's testimony that the Southwest Community Center project dragged until Mr. Rowe was assigned to work on it is incredible. Mr. Allen's testimony to the contrary, which I credit, set forth in specific terms what steps were taken. The documentary evidence, including YCDA board minutes, contains no reference to problems concerning the pace of the Southwest Community Center project. The fact is that Mr. Allen was not criticized concerning this project by a single YCDA board member until the October 12, 1982 memorandum. Defendants' claim that matters concerning the Southwest Community Center project were, in part, responsible for plaintiff's discharge, is pretextual.

Though the Commerce Kitchen rehabilitation project was not listed in Dr. Prezioso's memorandum as an example of the differences between plaintiff and defendants, Mayor Martinelli, at trial, referred to it as being a source of dispute in which plaintiff was involved. Plaintiff's actions concerning the Commerce Kitchen project were above reproach and were never the subject of criticism. Accordingly, defendants' citation of the Commerce Kitchen project as a basis for plaintiff's discharge is not supported by the facts and is deemed pretextual.

Plaintiff's position that the YCDA should not pay the library Con Edison bill, because HUD would consider it an ineligible expense, was a justified and responsible one. Dr. Prezioso agreed that Mr. Allen's primary responsibility as YCDA director was to insure that funds were spent in compliance with HUD's guidelines. I do not credit Dr. Prezioso's vague recollection, testified to at trial, that HUD subsequently sent correspondence indicating that payment of the bill would not be inconsistent with HUD guidelines. The mayor did not

---

**33.** I do not credit Dr. Prezioso's testimony that he had to place Mr. Rowe at DCD to help plaintiff with its management and that Mr. Allen only began to hold staff meetings after he was pressured to do so by Mr. Rowe. Nor do I credit Dr. Prezioso's testimony that written complaints were filed concerning the building inspections conducted under plaintiff's tenure as commissioner. No documentation exists concerning such complaints.

**34.** Dr. Prezioso testified that, though item 3 of his memorandum reads, "The HUD Audit and Urbanex," suggesting two separate areas of concern, item 3 was really concerned with Urbanex. He included the HUD audit only insofar as the Urbanex issue was discussed in the audit. Inasmuch as Dr. Prezioso alleged that Mr. Allen did not provide him with information about the audit, this charge is discredited by the record, which shows the HUD audit was sent to the city manager's office in 1982, was the source of publicity, and was the subject of meetings and memoranda to Dr. Prezioso from plaintiff and HUD.

even consider the Con Ed bill matter even a partial basis for any action taken.[35]

■■■ Conflicts with those in authority may constitute valid reasons for discharge, see *Davis v. State University of New York,* 802 F.2d 638, 642–643 (2d Cir.1986), *Meiri v. Dacon,* 759 F.2d 989, 997 (2d Cir. 1985); *Thermidor v. Beth Israel Medical Center,* 683 F.Supp. 403, 412 (S.D.N.Y. 1988), whether or not the conflict entails fault on the part of the employee. In *Davis* the evidence indicated that plaintiff had been unable to work with others. In *Toliver v. Community Action Commission to Help the Economy,* 613 F.Supp. 1070 (S.D.N.Y.1985), *aff'd,* 800 F.2d 1128 (2d Cir.1986), *cert. denied,* 479 U.S. 863, 107 S.Ct. 217, 93 L.Ed.2d 146 (1986); the court dismissed the action, finding that the employers had found Mr. Tolliver to be "hypertechnical and extremely difficult to work with.":

> "Title VII does not require that a Board of Directors or any employer be constrained to maintain in its employ a person who created or promotes extreme difficulty in effecting the legitimate objectives of the employer."

613 F.Supp. at 1073.

In *Sweeney v. Research Foundation of State University of New York,* 711 F.2d 1179 (2d Cir.1983), plaintiff was not given the position she desired, in part because she was caught in the cross-fire of an intra-organizational dispute. The court noted that while this was unfortunate for plaintiff, it did not amount to discrimination. *Sweeney,* 711 F.2d at 1187.

At least one case, *in dictum,* has suggested that "[t]here may be circumstances where a disagreement as to matters of policy, in which the plaintiff is unquestion-

ably correct, may permit an inference of illegal discrimination." *Toliver,* 613 F.Supp. at 1073. Other cases have focussed on the legitimacy of the employer's demands upon the plaintiff. *See Meiri v. Dacon,* 759 F.2d 989 (2d Cir.1985); (this issue considered at the *prima facie* stage of the *McDonnell Douglas* analysis); *Kephart v. Institute of Gas Technology,* 630 F.2d 1217, 1223 (7th Cir.1980) *cert. denied,* 450 U.S. 959, 101 S.Ct. 1418, 67 L.Ed.2d 383 (1981) (same).

■■■ But when an employer's reason for the action complained of has been shown to be idiosyncratic, unreasonable or riddled with error and where demeanor evidence and vagueness indicate that a pretext is involved, a factfinder may conclude, as I do in this case, that the alleged reasons are not the true rationale behind the action. *See Dister,* 859 F.2d at 1116; *Loeb v. Textron, Inc.,* 600 F.2d 1003, 1014 (1st Cir. 1979); *Sparks v. Pilot Freight Carriers, Inc.,* 830 F.2d 1554, 1564 (11th Cir.1987).

The record provides no support for the vague complaints concerning the plaintiff's management style and method of communication.[36] Discrimination of the type I find here was not and need not be citywide affecting all positions. It was the nature of plaintiff's duties combined with his race at the particular time in Yonkers history which made him vulnerable to dismissal without regard to performance. In reaching this conclusion I give no weight to any asserted racial comments by individuals which cannot as such be attributed to the ultimate decisionmakers of the institutional defendants.[37]

Nor can the totality of the acts of the institutional defendants be attributed to in-

---

**35.** The mayor's position concerning the payment of the bill was the same as that of the city manager's. However, the mayor testified at trial that the Con Edison bill was not a basis for his vote to dismiss Mr. Allen.

**36.** Indeed the record discloses that both the mayor and Dr. Prezioso had been aware at the time that Mr. Allen was discharged of the excellent reviews the YCDA had received from HUD under Mr. Allen's directorship.

**37.** While evidence of abusive comments regarding an employee's race made at the workplace

and condoned by an employer may be used to show a violation of Title VII, the context in which the comments were made and their degree are critical to such a determination. No evidence exists in the record to determine the degree of offensiveness of any particular comments and whether or not they were condoned by the Mayor. *Snell v. Suffolk County,* 782 F.2d 1094, 1102–1103 (2d Cir.1986); *Powell v. Missouri State Highway,* 822 F.2d 798, 806 (8th Cir.1987).

dividuals with separate partial roles. As noted in *United States v. Yonkers Board of Education,* 624 F.Supp. 1276, 1289 (S.D.N.Y.1985), *aff'd,* 837 F.2d 1181 (2d Cir. 1987), *cert. denied,* 486 U.S. 1055, 108 S.Ct. 2821, 100 L.Ed.2d 922 (1988):

> In performing this inquiry, we have examined the actions of many officials who, we are certain, were entirely well-meaning public servants acting in accordance with their perception of what was feasible in the political and socioeconomic circumstances of Yonkers and in the best interests of that community. In many instances, acts were taken by elected officials in response to strong constituent pressures and perceptions of political reality."

*Id.* at 1289.

Under the circumstances, the institutional but not individual defendants are found liable as noted above. In sum, with respect to plaintiff's claims under § 1983 and Title VII, I find that plaintiff has sustained his burden and has demonstrated that his discharge was the result of racial discrimination.

### 3. *Pendent Contract Claim*

Plaintiff also seeks to recover for breach of his employment contract, awarded to him by the YCDA board in November 1981. The contract provided that plaintiff would be employed at the YCDA for two years at an annual salary of $44,900.00. The contract also provided that defendant could be discharged only for cause. It further provided for certain steps to be followed in the event that the YCDA undertook to discharge plaintiff for cause.

■■■ Plaintiff asserts that the YCDA committed a breach of its employment contract with him when it discharged him in October 1982. Defendant YCDA asserts that at the time of plaintiff's discharge, and as a result of the YCDA board's vote not to ratify, the contract was no longer in existence.

**38.** Defendants concede as much in their proposed findings of fact: "HUD further indicated

Generally, an employee who does not work under an agreement for a definite term of employment may be discharged at any time, with or without cause. *Rothenberg v. Lincoln Farm Camp, Inc.,* 755 F.2d 1017, 1020–1021 (2d Cir.1985). However, where the employment is for a definite term, an employee may not be discharged by the employer without cause. *Rothenberg* at 1020–1021; *see also, Kemelhor v. Penthouse International, Inc.,* 689 F.Supp. 205, 213 (S.D.N.Y.1988); *aff'd,* 873 F.2d 1435 (2d Cir.1989). If the contract sets forth steps to be taken before an employee is terminated, failure to follow those steps would constitute a breach.

■■■ There was no cause for discharging plaintiff, and the procedures set forth in the contract for termination were not followed. Accordingly, the issue upon which plaintiff's contract claim succeeds or fails is whether or not an employment contract was in existence at the time of his discharge. To state it in another way, the issue is whether the YCDA board's vote against ratification of the contract entitled the board to rescind the contract.

The YCDA board grounds its decision to rescind the contract on HUD's March 1982 letter to Yonkers officials suggesting that the board vote on ratification of the contract with Mr. Pistone abstaining, and on the subsequent vote by the board declining to ratify the contract.

HUD's letter concerning possible ratification of the contract was merely a recommendation. The use of the term "ratify" indicates that HUD did not suggest that its letter constituted grounds to void the contract.

■■■ Though a tenet of contract law provides for performance under a contract to be excused if performance is made impracticable by a governmental regulation or order, Restatement of Contracts Second § 264, there was no such governmental regulation or order here. The letter from HUD in March, 1982 did not constitute a directive of any sort.[38] The party asserting

in these communications that the issue of the awarding of a contract to the director of the

a defense of impracticability has the burden of demonstrating that the event, in this case the HUD letter, made performance impracticable and that the event was not the result of that party's actions or inactions. *Kama Rippa Music, Inc. v. Sherkeryk,* 510 F.2d 837, 842–43 (2d Cir.1975).

The YCDA board's resolution declining to ratify the contract, and the city manager's letter declaring the contract null and void, constituted an anticipatory repudiation of the contract. Upon learning of the YCDA board's anticipatory repudiation, Mr. Allen had three possible courses of action: he could have quit and sued on the contract; urged the board to retract its repudiation; or ignored the repudiation and continued to work. Plaintiff responded to the anticipatory repudiation by ignoring it, comporting himself on the basis that the contract remained in full force. Since there was no power reserved to the board unilaterally to cancel the contract, it did in fact remain in force. The procedures preceding his discharge were not consistent with those required under the contract. Accordingly, his discharge, not authorized by the contract, constituted a breach thereof. Mr. Allen is entitled to damages measured by the amount of salary he would have earned if his employment had run its course under the contract.

4. *Damages*

The parties are directed to submit to the court within 30 days memoranda not to exceed 10 pages exclusive of exhibits concerning the award of damages and attorney's fees to plaintiff in light of this decision. The memoranda shall include legal authority for the propositions asserted.

SO ORDERED.

YCDA was a local issue and there were no prohibitions or directions of the Federal Government concerning that issue."